## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF IOWA

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | **Chapter 7** |
| **ARGRIPROCESSORS, INC.,** | ) | |
| | ) | **Bankruptcy No. 08-2751** |
| Debtor. | ) | |
| | ) | |
| **JOSEPH E. SARACHECK,** | ) | |
| in his capacity as | ) | |
| **CHAPTER 7 TRUSTEE,** | ) | |
| | ) | |
| Plaintiff, | ) | **Adversary No. 10-09108** |
| | ) | |
| v. | ) | |
| | ) | |
| **CROWN HEIGHTS HOUSE OF** | ) | |
| **GLATT, INC.,** | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## AMENDED MEMORANDUM AND ORDER

Chapter 7 Trustee, Joseph Sarachek, brought this case against Defendant,

Crown Heights House of Glatt, Inc., alleging that Defendant received fraudulent

conveyances or preferential transfers from Debtor totaling $5,364,090.33.  The

matter came before the Court for trial on November 13–14, 2013.  M. David

Graubard appeared for Defendant.  Dan Childers and Desirée Kilburg appeared for

the Trustee.  The parties agreed to await a transcript before briefing.  The matter

was submitted for decision on simultaneous briefs February 26, 2014.  This is a

core proceeding under 28 U.S.C. § 157(b)(2)(F) and (H).

## STATEMENT OF THE CASE

Trustee seeks to recover payments made from Debtor to Crown Heights

House of Glatt ("Defendant") totaling $5,364,090.33. Trustee seeks to recover all

these payments as fraudulent transfers under 11 U.S.C. § 548 or $4,427,090.33 of

the payments as preferential transfers to an insider under 11 U.S.C. § 547(b).

Trustee argues all payments Defendant received were constructively

fraudulent transfers because the payments were not made for reasonably equivalent

value.  Defendant argues it made loans to Debtor, and Debtor's repayments were

reasonably equivalent in value to the loans.  Defendant also argues that it made

more loans than Debtor repaid, and thus, the "totality of the transfers" show Debtor

received more than Debtor repaid.  Defendant concludes that Debtor received more

than reasonably equivalent value.

Trustee argues alternatively that the payments made within one year of

bankruptcy are also avoidable as preferential transfers to an "insider."  Defendant

concedes the Trustee can establish the elements for preferential transfers under

§ 547(b) but argues three affirmative defenses under § 547(c) apply.  Those

defenses are:  contemporaneous exchange for new value, ordinary course of

business, and subsequent new value.  Trustee argues that these exceptions do not apply.

This case presents unique facts and thus, unique legal questions.  For the following reasons, the Court finds that a significant portion of the payments that Debtor made to Defendant are constructively fraudulent transfers.

## BACKGROUD

Debtor owned and operated Agriprocessors, Inc.—one of the nation's largest kosher meatpacking and food-processing facilities in Postville, Iowa.  Aaron Rubashkin owned Agriprocessors, Inc. and a separate company with a similar name in Brooklyn, New York.  His sons Sholom, Moshe, and Heshy all worked for Agriprocessors.  The Iowa operation is the focus of this bankruptcy.  On November 4, 2008, Debtor filed a Chapter 11 petition in the Bankruptcy Court for the Eastern District of New York.  Debtor's bankruptcy petition and accompanying documents recited that its financial difficulties resulted from a raid conducted at the Postville, Iowa plant by U.S. Immigration and Customs Enforcement.  The raid led to numerous federal criminal charges, including charges against Debtor's president, Sholom Rubashkin.

The Bankruptcy Court approved the appointment of Joseph E. Saracheck as the Chapter 11 Trustee.  The Bankruptcy Court concluded that a trustee was necessary under 11 U.S.C. § 1104(a)(1) "for cause, including fraud, dishonesty,

incompetence, or gross mismanagement of the affairs of the debtor by current

management." The Eastern District of New York Bankruptcy Court transferred the

case to this Court on December 15, 2008. This Court converted the case to a

Chapter 7 bankruptcy. The U.S. Trustee for this region retained Mr. Saracheck as

the Chapter 7 Trustee.

## FINDINGS OF FACT

Defendant is in the business of selling kosher food products in Crown

Heights, Brooklyn, New York. Defendant operated for at least ten years before

Debtor filed bankruptcy. Defendant's sole shareholder is Gutel Tzivin, a niece of

Aaron Rubashkin (Debtor's owner) and first cousin of Shalom Rubashkin

(Debtor's president at all relevant times). Aaron Tzivin is Defendant's Vice

President and Gutel Tzivin's husband. Rivka Tzivin, Aaron and Gutel Tzivin's

daughter, is the Defendant's bookkeeper, and she testified at trial as the

Defendant's corporate designee.

## I. The Loan Relationship

This case involves a large set of financial transactions between Defendant

and Debtor. As Aaron Tzivin made clear in his testimony, Defendant never

purchased any product from Debtor. It did, however, regularly purchase product

from Agriprocessors in Brooklyn—which is not part of this case. Mr. Tzivin

asserted all payments between Debtor and Defendant were loans and repayments.

It is undisputed that huge sums of money flowed back and forth between Debtor and Defendant. The first flow of money came from Debtor to Defendant starting in 2006. The parties offered no explanation why this money was paid from Debtor to Defendant. This continued into 2007. The total flow from Debtor to Defendant before Defendant even claims it made the first loan was $427,500. Trustee believes this shows there was no lender-borrower relationship as Defendant argues. Trustee points out that borrowers do not pay lenders well before the first loan is made.

Aaron Tzivin insists that Defendant made loans to Debtor here. Mr. Tzivin admits neither party kept a record of any of these loans. The loan agreement was entirely oral. Defendant did not charge interest on the loans. Defendant did not make loans to any other individual or entity. Aaron Tzivin gave these loans to Debtor and did not even require a note.

Aaron Tzivin points out that the context of the loans is critically important here. The Rubashkin and Tzivin families come from the same Orthodox Jewish Community in Brooklyn, New York—Chabad-Lubavitch Community. Mr. Tzivin explained in live testimony and in Court filings that loaning money in this fashion was common practice in their Orthodox Jewish Community and tied to religious duty in that community.

In earlier filings with the Court, Defendant noted: "In the Chabad-Lubavitch Community, it is common for businessmen to make short-term loans to each other." Pretrial Statement at pg. 4. Defendant also noted "Pursuant to Orthodox Jewish law, Defendant did not charge interest to Debtor in the loans that Defendant made to Debtor." Id.

In the case brought by First Bank against Defendant in the United States District Court for the Northern District of Iowa, Aaron Tzivin provided an affidavit noting: "As required by our religious beliefs, members of my Hasidic Community do not charge interest to each other. See Leviticus 25:37 ("Do not give him your money for interest"); Deuteronomy 23:20-21 (prohibiting charging of interest between Jews)." CM/ECF Doc. No. 75-2 at 7.

In August 2007, Moshe Rubashkin, on Debtor's behalf, asked Aaron Tzivin for a one-day, $125,000.00 loan. Mr. Tzivin gave the loan to Debtor, and Debtor, as promised, repaid the loan the next day. This was the first money sent from Defendant to Debtor. Mr. Tzivin did not require a promissory note, contract, or any other evidence of the loan. While Mr. Tzivin believed this loan was made in late 2006 or early 2007, Defendant's own Exhibit T shows the first loan in August 2007. Defendant repeatedly noted at trial and its post-trial briefing that Exhibit T was **the** best documentation for the loans. Mr. Tzivin himself noted as much.

Then, hundreds of transactions occurred between Defendant and Debtor from August 2007 to September 2008. Defendant characterizes these transactions as short-term loans. Defendant explicitly approved the first few loans—by writing and sending the checks to the Debtor—and the loans were repaid by overnight check. Normally, the checks from Debtor to Defendant cleared within a few days.

At some point near the beginning of this "loan" relationship, Defendant gave Debtor a set of "window checks." These "window checks" were printed with Defendant's name and allowed the Rubashkins to write checks on Defendant's bank account without any additional approval from Defendant's representatives. Sholom Rubashkin was the only person to sign the "window checks."

Aaron Tzivin's testimony about his contacts with Debtor was unclear and somewhat contradicting. He first stated he never spoke to Sholom Rubashkin, just Moshe. He stated he believed Moshe must have told Sholom about the window checks and Sholom then used them on his own. Mr. Tzivin later seemed to suggest he discussed the window checks with Solom Rubashkin. While who he talked to and when remains unclear, the record is undisputed that the window checks had a four-digit check number instead of Defendant's normal five-digit check number. The window checks also did not have Gutel Tzivin's signature on them, unlike Defendant's regular checks.

These window checks allowed Debtor (solely through Sholom Rubashkin) to control when the loan was made.  Aaron Tzivin admitted that this window check arrangement "effectively gave the Debtor a credit line on [Defendant's] bank account."  Defendant placed no limits on Debtor's access to Defendant's bank account.  Some of the checks drawn on Defendant's account were for round dollar amounts, while others were for uneven dollar amounts.  Sholom Rubashkin used some of these window checks to make loans to third parties.  In particular, Sholom Rubashkin made out several checks as loans to Best Value, another company of which he was an officer.

The majority of loan payments from Defendant to Debtor came from the "window checks" process.  Defendant, however, also claims it made payments through regular checks and wire transfer.

This type of "lending" practice is not typical in arm's length commercial relationships that normally come before this Court.  Nonetheless, the Court rejects Trustee's argument that there is no loan relationship here at all.  Moreover, Trustee has submitted no evidence to support his argument that the Tzivins or Defendant acted in any inappropriate or fraudulent manner.  On this record, the Court finds that the Tzivins and Defendant acted out of a sense of religious affinity and community, and a desire to help the Rubashkin family.

While neither Aaron Tzivin nor Defendant has been shown to have acted

fraudulently, the evidence does show that they failed to provide any meaningful

oversight of the lending relationship.  Mr. Tzivin admitted that he did not know:

why Debtor needed the money, when most of the transactions occurred, the total of

each transaction, or even that money was "loaned" to parties other than Debtor.  As

noted in his testimony, Mr. Tzivin remembers having only the initial conversation

about the loans with Moshe Rubashkin.

## II.  The Loan Relationship Perpetuated Sholom Rubashkin's Fraud

This lack of oversight not only contributed to the problem before this Court,

it actually contributed to the overall fraud Sholom Rubashkin perpetrated on

Debtor's entire creditor base.  It is not an overstatement to suggest that Mr. Tzivin

effectively gave Sholom Rubashkin a bank account with unlimited access—one

that gave Rubashkin sole control over both lending and repayment.  The motive,

reason, or rationale for allowing this process may have been religious or charitable,

but the arrangement furthered a financial disaster.

The undisputed evidence shows quite vividly that the money at issue here

eventually became intimately involved in the financial fraud.  At some point during

this window check lending process, Sholom Rubashkin began creating false

invoices that purported to show that Debtor sold product to Defendant.  These sales

never occurred.  Defendant purchased products from Agriprocessors in New York,

but never purchased from Agriprocessors in Iowa. Debtor used these false

invoices to get additional credit from its primary creditor, First Bank Business

Credit ("First Bank"). Debtor showed the false invoices to First Bank but never

sent them to Defendant. First Bank gave Debtor a credit line up to $30 million

based on a formula that allowed Debtor to borrow up to the limit if invoices and

incoming accounts receivable reached certain levels.

These false invoices had to be paid in full within 60 days to continue to

deceive First Bank. The window check arrangement made it much easier for

Debtor to pay off these false invoices to Defendant. Debtor used Defendant's own

money to pay them. That explains why many of the window check loans were for

uneven dollar amounts: Debtor wrote them to pay off the invoices that were made

out in uneven dollar amounts. These false invoices made out to Defendant (but

never sent) thus helped keep Debtor afloat for longer because Debtor fooled First

Bank into lending more to Debtor than could possibly be repaid. As a result,

Debtor was able to obtain a significantly greater debt to First Bank, which, in the

end, left even less for lower priority creditors. This whole arrangement allowed

Debtor to appear solvent and stave off bankruptcy, but was ultimately detrimental

to the estate.

Trustee has suggested or implied at several points that Defendant or Aaron

Tzivin had some role in this deception or participated actively in the fraud.

Trustee, however, produced no evidence whatsoever to support these suggestions. The Court finds, therefore, that any arguments built on suggestions that Defendant or Aaron Tzivin engaged in knowing or actual fraud are entirely without merit.

### III.  Determining "Loan" Amounts

At a few points in the loan process, the bookkeeping provided a clear correlation between the loans and repayments.  Most of the time, however, this became quite difficult to discern and testimony from Defendant further confused, instead of clarified, the issues.  In particular, at critical points, Defendant had trouble explaining how the amounts debited and credited are connected to each other.  Defendant failed to produce a coherent and consistent narrative on the subject.  Defendant designated Rivkah Tzivin as its witness to explain the flow of money and how it correlated to a lender-borrower relationship.  Ms. Tzivin is the daughter of Aaron Tzivin and Gutel Tzivin and current bookkeeper for Defendant. She did not, however, have any role in making the "loans" or keeping track of payments when they were made.  She began as a bookkeeper for Defendant long after this all occurred.  In short, she had no firsthand knowledge of any of the transactions relevant to the case.

Rivkah Tzivin attempted to explain, from a list she prepared, how the checks matched up.  Aaron Tzivin first told Rivkah Tzivin to prepare a list of his transactions with Debtor for his use while testifying at Solom Rubashkin's criminal

trial.  Ms. Tzivin admitted that while doing the analysis her starting point was her
father's request to simply look for four-digit "window checks" and for "big
checks" or transfers that would be out of the ordinary.  Her job was made more
difficult because Defendant did not even have a majority of the checks until well
after the fact.    After completing that list—drawn solely from bank statements that
rarely specified the check recipient—she obtained some of the checks from bank
records.  Like all lists Defendant produced, the original list Rivkah Tzivin prepared
showed payments from Defendant to Debtor that exceeded the amount Trustee
claims in this case.  That exhibit showed Defendant provided Debtor with
$6,614,947.73 in loans.  (Exhibit M).

Ms. Tzivin later prepared a "revised" list, removing some checks obviously
not made out to Debtor or "Rubashkin" entities.  The revised list totaled
$6,414,515.14 (Exhibit T).  This list would change a few more times—increasing
substantially—before eventually reverting to this number halfway through the trial.

In their Joint Pretrial Statement filed on November 29, 2012, for example,
the parties stipulated that, in the two years before bankruptcy, Debtor paid
Defendant $5,364,090.33 (the amount Trustee seeks to recover in this case).    The
parties also stipulated that in the two years before Debtor's bankruptcy, Defendant
made transfers to Debtor of $4,905,909.28.  Defendant also reserved the right to
argue that it made additional transfers to Debtor at trial.  Throughout the case,

12

Defendant has submitted lists showing a much higher loan amount.  In one list, Defendant claimed to have made loans of $7,515,458.89.  (Exhibit J).  These amounts also correspond to Exhibit E.  On December 20, 2012, Defendant then submitted a new substitute loan list, showing that Defendant claimed it loaned Debtor $7,749,363.77.

At trial, Defendant initially used these larger numbers and exhibits, but ultimately reverted back to arguing there were $6,414,515.14 in loans as shown in Exhibit T.  Defendant then steadfastly maintained Exhibit T shows all the loans in the two year period prior to bankruptcy.  Trustee believes the credible evidence shows Defendant made substantially less in actual "loans" than any of the exhibits show.

The documentary evidence Defendant offered furthered the confusion on the amount Defendant transferred and/or loaned to Debtor.  Many of the checks Defendant claims show such loans are illegible copies.  Some of the checks are clearly made out to other parties.  Defendant claims it removed all checks to third parties, other than those paid to Best Value, which Defendant believed was part of Agriprocessors.  Defendant also relies on checking account withdrawals, wire transfers, or other non-descriptive entries from bank statements to claim support for its "loan" numbers.

Defendant attempted to put in the missing evidence about how the loans were made and how the lending worked through Aaron Tzivin.  Mr. Tzivin, however, specifically testified that he discussed only the initial transfer and the use of window checks one time and only with Moshe Rubashkin.  In that testimony, he says he never spoke with Sholom Rubashkin and had virtually no oversight of the account.  Later, he appeared to back track and suggested that he may have talked to Sholom Rubashkin.  He also then attempted to provide testimony connecting checks to repayments.

Aaron Tzivin either admitted, or his testimony clearly revealed, that he provided little oversight in the process and thus, documentation and accounting was all done in hindsight.  He pointed out that his religious belief dictated that he support and trust members of his Orthodox Jewish community.  He notes that he did this for the Rubashkins and Sholom Rubashkin took advantage of him as well.[1]

---

[1] He alleges that he has a sizable claim for unpaid loans against Debtor in this bankruptcy even if he prevails in this case.  However, he has filed no claim in this case.  He noted in earlier filings that members of his religious "community also are prohibited from proceeding against each other in secular court.  Instead, members of the community take their disputes to a rabbinical court . . ."  CM/ECF Doc. 75-2 at 7.

## CONCLUSIONS OF LAW

### I.      Fraudulent Transfers

Debtor wrote 111 checks to Defendant totaling $5,364,090.33 in the two

years before filing bankruptcy.  Trustee first seeks to avoid these transfers as either

actually or constructively fraudulent transfers under 11 U.S.C. § 548.

### A. Actual Fraud

At trial, Trustee asserted that Defendant should be held liable on the

fraudulent conveyances claim because Defendant had "unclean hands."  Trustee's

theory seemed to be that Defendant was so lax in its financial dealings with Debtor

that Defendant's conduct constitutes actual fraud.  There are two major problems

with Trustee's theory.  First, he did not plead it.  Second, even if the Court

considers it (which it need not), he has no evidence to support it.

Section 548 provides that, to avoid a transfer as actually fraudulent, the

trustee must show, among other things, "actual intent to hinder, delay, or defraud"

creditors.  11 U.S.C. § 548(a)(1)(A) (2014).  In some cases, a transferee's clear

involvement in fraud can prevent the transferee from asserting certain defenses.

Sarachek v. Twin City Poultry (In re Agriprocessors, Inc.), Bankr. No. 08-02751,

Adv. No. 10-09220, 2013 WL 1402414, at *6 (N.D. Iowa April 3, 2013) (citing

Elway Co., LLP v. Miller (In re Elrod Holdings Corp.), 421 B.R. 700, 709 (Bankr.

D. Del. 2010)).  Here, Trustee provided no evidence of Defendant's knowing

involvement (or any involvement) in fraud.   Defendant trusted Debtor's officers

and gave financial assistance to Debtor out of religious duty, community, and trust.

Whether Defendant may have been inattentive in its dealings with Debtor or placed

too much trust in Debtor's principals is irrelevant to the Trustee's suggestions

about actual fraud.   Trustee entirely failed to show actual fraud by Defendant, and

the Court will not impute Debtor's fraud to Defendant in the summary fashion

Trustee requests.

### B. Constructive Fraud

Trustee also seeks to avoid these transfers as constructively fraudulent

transfers under § 548.  Section 548 provides:

> The trustee may avoid any transfer . . . of an interest of the debtor in
> property . . . that was made . . . within 2 years before the date of the
> filing of the petition, if the debtor voluntarily or involuntary—
> . . .
> (B)(i) received less than a reasonably equivalent value in
> exchange for such transfers . . . ; and
> (ii)(I) was insolvent on the date that such transfer was made . . .

11 U.S.C. 548(a)(1).  Thus, to avoid the transfers within the two-year period the

Trustee must show that:

> (1) the debtor had an interest in property; (2) a transfer of that interest
> occurred within two years of the bankruptcy filing; (3) the debtor was
> insolvent at the time of the transfer . . . ; and (4) the transfer resulted
> in no value for the debtor or the value received was not 'reasonably
> equivalent' to the value of the transferred property interest.

Goodman v. H.I.G. Capital, LLC (In re Gulf Fleet Holdings, Inc.), 491 B.R. 747, 762 (Bankr. W.D. La. 2013). If a debtor received reasonably equivalent value, constructive fraud is not present. See Stalnaker v. Gratton (In re Rosen Auto Leasing, Inc.), 346 B.R. 798, 805 (B.A.P. 8th Cir. 2006) (finding no fraudulent conveyance where a transferee wrote a check equal to the amount of outstanding debt, satisfying the claim).

Here, it is uncontested that the debtor had an interest in the property, that the transfer of that interest occurred within two years of the bankruptcy filing, and that the debtor was insolvent at the time of the transfer. The only disputed element is whether the payments made by Debtor to Defendant within the two years before bankruptcy were in exchange for reasonably equivalent value. Defendant argues that all payments by Debtor were for reasonably equivalent value because they were all loan repayments. Trustee argues that while some of these transfers probably were for reasonably equivalent value, a large number were not. Trustee believes he has shown that lack of reasonably equivalent value, and Defendant has failed to show reasonably equivalent value.

## 1. Reasonably Equivalent Value

Deciding whether the transfer was made for reasonably equivalent value requires three steps. The court must find "whether (1) value was given; (2) it was given in exchange for the transfers; (3) what was transferred was reasonably

equivalent to what was received." Sarachek v. Hilgar (In re Agriprocessors, Inc.),

Bankr. No. 08-02751, Adv. No. 10-09217, 2014 WL 1454187 (Bankr. N.D. Iowa

Apr. 15, 2014). "Retirement of prior debt is reasonably equivalent value for

purpose of the fraudulent conveyance defense." Sarachek v. Cohen (In re

Agriprocessors, Inc.), Bankr. No. 08-02751, Adv. No. 10-09197, 2013 WL

1385400 (Bankr. N.D. Iowa Apr. 3, 2013).

Here, some of the transactions appear to be loans from Defendant that

correlate to Debtor's repayments.  Some of the checks from Debtor to Defendant,

however, were written **before** Debtor owed money to Defendant.  Thus, there were

transfers from Debtor to Defendant when no debt existed to pay down.  As a result,

Trustee argues Debtor could not possibly have received value for these transfers

made before it owed any debt to Defendant.  Trustee also argues that the evidence

showed there were other payments from Defendant to Best Value that Debtor paid

back, and significant additional over-payments made by Debtor to Defendant after

Defendant started making the loans.  Trustee argues none of these can possibly be

payments for reasonably equivalent value, because Debtor received nothing for

them.

Defendant argues the Court should not apply Trustee's analysis here.

Instead, Defendant urges the Court to aggregate all the transfers from Defendant to

Debtor and then compare that total with the aggregate total from all the transfers

from Debtor to Defendant.  Defendant argues that the total of all the transfers from

Defendant to Debtor—approximately $6,400,000—far exceeds the approximately

$5,300,000 Trustee seeks to recover.  Defendant also argues that even the

payments Debtor made that were not directly tied to Debtor's existing loan balance

should be part of the reasonably equivalent value analysis.  Defendant notes that as

far as it knew, the only money it paid out were loans that correlated with what it

received in loan payments.  The Court will address Defendant's argument for using

an aggregate sum—the totaling of transfers—to analyze this case before addressing

Trustee's arguments.

### a.  Totality of the Transfers

Under Defendant's "totality of the transfers" analysis, Defendant extended

reasonably equivalent value because, in total, Debtor borrowed much more from

Defendant than it repaid to Defendant.  Defendant asks the Court to rely on this

fact to find that Defendant gave reasonably equivalent value for all of the transfers.

Defendant cites DVI, Inc. v. Merrill Lynch & Co. (In re DVI, Inc.) Bankr. No. 03-

12656 (MFW), Adv. No. 08-50248 (MFW), 2008 WL 4239120 (Bankr. D. Del.

Sept. 16, 2008), and Hill v. Oria, (In re Juliet Homes, LP), Bankr. No. 07-36424,

Adv. No. 09-03429, 2011 WL 6817928 (Bankr. S.D. Tex. Dec. 28, 2011), for

support.

In <u>DVI, Inc.</u>, the Trustee alleged in his complaint that, although individual transfers may not have been actually fraudulent, the "totality of the transfers constituted a fraud." <u>In re DVI, Inc.</u>, 2008 WL 4239120, at *8.  In that case, the court found that Trustee's fraud complaint was pleaded with sufficient particularity to survive a motion to dismiss under F.R.C.P. 9(b).  <u>Id.</u>  The court found only that the complaint "adequately advis[ed defendant] of the gravamen of [the] claim," not that the theory of recovery was valid.  <u>Id.</u> at *8–9.  Moreover, in <u>DVI</u> the Defendant raised this "totality of the transfers" theory in the context of pleading actual fraud—not calculating reasonably equivalent value in the constructive fraud context.  The Court finds this authority unpersuasive to support Defendant's theory.

Defendant's other case authority also addresses adequacy of pleading.  <u>In re Juliet Homes, LP</u>, 2011 WL 6817928.  The trustee in <u>Juliet Homes</u> alleged that a set of transfers was unsupported by reasonably equivalent value.  There the court found that "[i]t was **not necessary** for the Trustees **to plead** that each individual transfer was made without reasonably equivalent value." <u>Id.</u> at *14 (emphasis added).  That does not mean, however, that it is sufficient to point to the "totality of the transfers" to determine reasonably equivalent value.  In fact it suggests the opposite—that it is necessary for a trustee to eventually prove up "that each individual transfer was made without reasonably equivalent value," even though

pleading with such particularity is unnecessary.  Regardless, <u>Juliet Homes</u> does not

support Defendant's "totality of the transfers" theory.

Defendant's theory is out-of-step with settled case law.  "The proper focus

of the reasonably equivalent value inquiry is the specific transaction sought to be

avoided . . . ."  <u>Image Masters, Inc. v. Chase Home Fin.</u>, 489 B.R. 375, 390 (E.D.

Pa. 2013).  "The focus of the inquiry . . . is the specific transaction the trustee seeks

to avoid, i.e., the quid pro quo exchange between the debtor and transferee . . . ."

<u>Balaber-Strauss v. Sixty-Five Brokers</u> (<u>In re Churchill Mortgage Inv. Corp.</u>), 256

B.R. 664, 678 (Bankr. S.D.N.Y. 2000) <u>aff'd sub nom.</u> <u>Balaber-Strauss v.</u>

<u>Lawrence</u>, 264 B.R. 303 (S.D.N.Y. 2001).

As a result, the Court will not use Defendant's "totality of the transfers"

theory.  The Court will instead focus on each check from Debtor to Defendant to

determine whether it was given for reasonably equivalent value.  In doing so, the

Court is mindful that the analysis calls for "reasonably equivalent" and not

"exactly equivalent" value.

### b. Transfers That Did Not Pay Off a Preexisting Debt of Debtor to Defendant

In general, many transfers from Debtor to Defendant did in fact appear to

pay down a preexisting debt.  But three types of transfers did not.  First, transfers

from Debtor to Defendant made before the loan arrangement began did not pay

down a preexisting debt.  Second, transfers that paid off loans made to third parties

21

did not pay down a preexisting debt. Third, transfers that overpaid loan amounts due or owing did not all pay down pre-existing loans. As a result, Trustee argues these transfers are constructively fraudulent. Defendant argues these transfers should all be treated as paying pre-existing debt because Debtor's only relationship with Defendant was that of a borrower. The Court rejects Defendant's argument on all three types of payments.

### i. Transfers Made by Debtor to Defendant Before the Loan Arrangement Began

The record shows that loans from Defendant to Debtor began in August 2007. Trustee argues checks from Debtor to Defendant before August 2007 did not repay a preexisting debt because no loans had been made and no debt existed.

Defendant argues first that the record shows transfers from Defendant to Debtor starting on January 2, 2007, not August 2, 2007. Defendant relies on testimony from Aaron Tzivin in which he asserted his "belief" that the first loan made to Moshe Rubashkin occurred in late 2006. He also points to his bank statement to show that on January 2, 2007, $125,000 went out of his account by wire transfers to a numbered account and that a $125,000 deposit went in. There is no evidence in the record, however, that the wire went out to Debtor or to an account connected to Debtor. The Court finds, as Aaron Tzivin repeatedly stated in his testimony, that he has no specific record or recollection of the details and timing of any particular transaction. There are similar problems with two checks

22

numbered 21052 and 21093 in March and April 2007 that he also claims went to Debtor.  The Court finds he had no knowledge or memory of the particular time and date of any transfers or that any specific transfers went to Debtor.

Moreover, Defendant specifically noted that it relied on Exhibit T to show all the transfers it made to Debtor.  Aaron Tzivin confirmed Exhibit T correctly showed all the transfers from Defendant to Debtor.  Defendant then relied on Exhibit T throughout the remainder of trial and post-trial briefing as the definitive showing of what transfers Defendant made to Debtor.  The **first** transfer from Defendant to Debtor on Exhibit T, however, is August 2, 2007—not January 2007 as Mr. Tzivin suggests.

Defendant's second response to this "prepayment" issue is again a variant of the "totality of the transfers" theory that the Court has declined to use.  Defendant seems to contend the early transfers were essentially pre-payments for loans that would not be made until over a year later.  In fact, Defendant presents no evidence that these first checks were given in exchange for anything.  Defendant's mere belief that this was all part of a loan agreement is belied—if not directly contracted—by the record.  As a result, these "pre-loan-arrangement transfers" from Debtor to Defendant were not given in exchange for reasonably equivalent value.   These payments are constructively fraudulent.

The pre-loan arrangement checks are listed below:

1. Check #124477 dated 12/7/06 for $2,500.00

2. Check #126663 dated 12/15/06 for $125,000.00

3. Check #129577 dated 12/29/06 for $25,000.00

4. Check #129578 dated 12/29/06 for $100,000.00

5. Check #130648 dated 02/28/07 for $50,000.00

6. Check #137218 dated 06/21/07 for $50,000.00

7. Check #137417 dated 06/29/07 for $25,000.00

8. Check #137418 dated 06/29/07 for $50,000.00

These checks total $427,500. This amount is recoverable under Trustee's

constructively fraudulent transfer theory.

### ii. Transfers from Debtor to Defendant that Paid off Loans Made To Best Value

Some of the transfers from Debtor to Defendant paid off loans made to third-

party companies.  In particular, Debtor paid off loans that Defendant (through

Sholom Rubashkin writing window checks) made to Best Value.  Best Value is a

separate company also owned or controlled by the Rubashkins.  When Sholom

Rubashkin made out window checks to Best Value, those were loans to Best

Value—not to Debtor.

"Generally, when a debtor pays the debt of a third party, there is not

reasonably equivalent value to the debtor."  Sarachek v. Wahls (In re

Agriprocessors, Inc.), 490 B.R. 374, 382 n.1 (Bankr. N.D. Iowa 2013) (citing

Rummill v. Greensfelder, Hemker & Gale (In re Richards & Conover Steel, Co.),

267 B.R. 602 (B.A.P. 8th Cir. 2001)).  But "[r]easonably equivalent value may be

demonstrated by showing the effect that the transfer had on the debtor."  Id. (citing

Sullivan v. Schultz (In re Schultz), 368 B.R. 832, 836 (Bankr. D. Minn. 2007)).

Although Defendant asserts that any and all window checks ultimately were

"for the benefit of the debtor," Defendant provides no evidence to support this

assertion.  Debtor did not benefit from the loans from Defendant to Best Value or

by repaying Defendant for the loans to Best Value.  At most, those Best Value

loans benefited Sholom Rubashkin—who had sole control over the window checks

and who was also an officer of Best Value.  But Best Value was, and continues to

be, a separate legal entity.  It reorganized in a separate Chapter 11 proceeding

before this Court.  The Court must conclude that the payments to Defendant for

loans to Best Value did not provide any reasonably equivalent value to Debtor.

The fact that Defendant had no control over the window checks does not

help Defendant.  The money ultimately went to Best Value.  The fact Defendant

believed that all the money was for the same purpose and was intended to benefit

Debtor is not enough to escape liability here.

In fact, Defendant's beliefs and assumptions help demonstrate how and why

Defendant got into this awkward position.  Defendant effectively handed over its

checkbook to Sholom Rubashkin.  Defendant surrendered any supervision and control of the lending or repayment process.  Defendant allowed Rubashkin to determine the loan amounts, what entity received the loan, when it received it, and how and when it was repaid.  Defendant essentially allowed Rubashkin to establish the details that governed lending and repaying.  Rubashkin decided to add Best Value as a borrower.  Defendant put faith and trust in Sholom Rubashkin, and Sholom Rubashkin violated that trust.  Defendant is stuck with the consequences.  One of the consequences is that when the loans made to Best Value were repaid by Debtor, the law requires the Court to find Debtor did not receive reasonably equivalent value.

The determination that loans to Best Value do not represent value to Debtor does not, itself, help identify which payments from Debtor to Defendant were payments for Best Value loans, and thus unsupported by reasonably equivalent value.  The correlation between the loan amount and the repayment amount was not completely clear in the bookkeeping.

Defendant itself, however, has offered the evidence matching up Best Value loans and repayments through Aaron Tzivin.  Mr. Tzivin went to great lengths to show, with his lawyer's guidance, how all the loans matched with repayments.  This included Best Value checks and Debtor's repayment.  Moreover, to remove any doubt, Defendant offered two tables as a part of an appendix to its post-trial

briefing that did the matching.  Reading Table 2 and Table 5 together, Defendant

showed how Debtor paid Defendant back on loans Defendant made to Best Value.

Given this record, the Court finds all the checks from Defendant to Best Value

were repaid by Debtor and are payments made by Debtor to Defendant for less

than reasonably equivalent value.  This means the $659,650.68 in loans to Best

Value (Defendant's Post-Trial Brief, App. #3 plus Check #7705 Defendant's

Exhibit D) will be treated as repaid by Debtor—and treated as payments by Debtor

for third parties—thus providing no reasonably equivalent value to Debtor.  The

legal status of the payments is the same as the pre-payments—they are

constructively fraudulent.

### iii.  Overpayments on Loans

As the Court has noted several times, in many instances in this case there is

a discernable correlation between the alleged loan amount from Defendant and the

repayment amount from Debtor.  At a number of periods, however, any discernable

correlation entirely disappeared.  At times it appeared money simply washed back

and forth between Debtor and Defendant.  From the Court's perception, this

seriously complicates the analysis of reasonably equivalent value.  From the

Trustee's perspective, this shows conclusively that many payments made by

Debtor to Defendant had no correlation to whatever loans Defendant provided.

If the transactions had kept a tight correlation between loan and repayment—all loans went to Debtor, and Debtor repaid only the loans made to it—then the balance of the exchanges would generally be at or near zero on the books. While Mr. Tzivin testified that this is how the loan agreement was supposed to work—loan one day and repayment the next—it did not in fact work out that way. The regular departures from such a tight loan and repayment process led to exchanges between Debtor and Defendant that never zeroed-out.

A careful study of the loan to repayment ledger shows Debtor continued overpaying or paying before the actual loan was made—even after deducting the pre-loan arrangement payments and Best Value payments noted in the two previous sections. This number of those additional overpayments reached approximately $210,000 as of January 22, 2008. That number reflects the highest amount by which Debtor paid Defendant over and above loan repayments—even after taking out all pre-loan payments and all Best Value transactions. This analysis is reflected in the Appendix.

The $210,000 high-point is an appropriate figure for the total of overpayments (excluding pre-loan and Best Value payments). That $210,000 is thus recoverable as transfers made by Debtor to Defendant for less than reasonably equivalent value.

While the inquiry normally does not end with such a number "[a] finding of reasonably equivalent value does not require evidence of a dollar-for-dollar exchange." Henderson v. Legal Helpers Debt Resolution (In re Huffman), 505 B.R. 726, 754 (Bankr. S.D. Miss. 2014), it actually does end with that number here. Trustee made a prima facie case of no reasonably equivalent value for these exchanges. Defendant did not show that the $210,000 in overpayments as of January 22, 2008 was supported by reasonably equivalent value. Defendant simply relied on a variant of the "totality of transfers" analysis the Court has rejected.

Adding the $210,000 overpayment high-point to the $427,500.00 in pre-loan-arrangement checks and the $659,650.68 in payment of Best Value loans, the Trustee has shown he is entitled to recover $1,297,150.68 as constructively fraudulent transfers.

## C. Trustee's Argument that All Payments from Debtor to Defendant Were for Less than Reasonably Equivalent Value

Trustee makes an additional, more far-reaching argument: even if some of the transfers from Debtor to Defendant did in fact pay down pre-existing loan debt, none of the loans added real value to the estate. Thus, all of the payments from Debtor to Defendant could be avoided because there was no reasonably equivalent value that ever went to the estate. Trustee's argument deals with the intricacies of Debtor's fraud.

Trustee points out all of the loan checks from Defendant were deposited into a special lockbox bank account in Decorah, Iowa.  The lockbox was supposed to be for customer account payments only and thus reflect actual sales receipts. Debtor's primary lender, First Bank, used the balance in the lockbox account as part of a calculation to determine how much Debtor was able to borrow.  Trustee argues because the vast majority of loan funds were used to inflate this "actual sales receipts" numbers and the loans from Defendant ultimately only "served to plunge Debtor further into debt."  In short, First Bank extended far more credit than it would have if the loans from Defendant did not artificially inflate the "customer receipt" accounts.  Trustee reasons that the "net effect" of Defendant's loans was to allow Debtor to acquire more unpayable debt, and Debtor did not receive any real value—let alone reasonably equivalent value for the loans.

The Court rejects Trustee's argument on this point for similar reasons to those used to reject Defendant's "totality of transfers" analysis.  The overall effect on the estate is not the focus of the reasonably equivalent value analysis.  Instead, "[t]he focus of the inquiry . . . is the specific transaction the trustee seeks to avoid, i.e., the quid pro quo exchange between the debtor and transferee, rather than an analysis of the transaction's overall value to a debtor as it relates to the welfare of the debtor's business."  Balaber-Strauss v. Sixty-Five Brokers (In re Churchill Mortgage Inv. Corp.), 256 B.R. 664, 678 (Bankr. S.D.N.Y. 2000) aff'd sub nom.

Balaber-Strauss v. Lawrence, 264 B.R. 303 (S.D.N.Y. 2001).  Transactions that

"exacerbate the harm to creditors and diminish the debtor's estate from an overall

perspective does not mean that the debtor received less than reasonably equivalent

value" with respect to each individual transaction.  Id. at 680–81 (internal

quotation mark omitted).  "The proper focus of the reasonably equivalent value

inquiry is the specific transaction sought to be avoided, not the transfer's collateral

effects on the welfare of a debtor's business."  Image Masters, Inc. v. Chase Home

Fin., 489 B.R. 375, 390 (E.D. Pa. 2013).  The ultimate effect of the Debtor-

Defendant loan arrangement on the estate is not part of the reasonably equivalent

value analysis in the way Trustee argues it here.

### D.  Trustee's Argument That Defendant Should Be Barred by Equitable Principles from Showing Reasonably Equivalent Value

Trustee also argued at trial that Defendant is equitably barred from arguing

that Defendant gave reasonably equivalent value for the transfers.  This theory is

based on Trustee's assertion that Defendant has "unclean hands" either by

participation in the fraudulent scheme or by enabling it through total lack of

supervision.

Even assuming, for purposes of argument, that this theory has legal support,

the Court summarily rejects it here.[2]  Trustee put on no evidence at all of

---

[2] Defendant's argument that it gave reasonably equivalent value for the transfers is
not an equitable defense—it is an attack on the Trustee's case.  "Trustee has the

Defendant acting with unclean hands.  The Court finds absolutely no basis for

barring Defendant's defenses based on equitable principles.

## II.  Preferential Transfers

Trustee also seeks to avoid all of the payments from Debtor to Defendant

within one year of the filing of the petition as preferential transfers to an insider

under 11 U.S.C. § 547.  Trustee asserts Debtor wrote 96 checks to Defendant

within the one year of Debtor's November 4, 2008 bankruptcy filing, which totaled

$4,427,090.33 of preferential transfers.  A number of these checks were addressed

above and found to be constructively fraudulent transfers that the Trustee can

recover.  Those checks from Debtor to Defendant will not figure into the

preferential transfer analysis.  The Court will thus determine whether the

remaining checks, which total $4,086,090.33, are avoidable as preferential

transfers under § 547.[3]

---

burden of proving by a preponderance of the evidence that the transfer was not for
reasonably equivalent value."  Sarachek v. Wahls (In re Agriprocessors, Inc.), 490
B.R. 374, 381 (Bankr. N.D. Iowa 2013).  "Arguing that the Trustee has failed to
[show less than equivalent value] is not an affirmative defense and makes no
appeal to equity."  Sarachek v. Twin City Poultry (In re Agriprocessors, Inc.),
Bankr. No. 08-02751, Adv. No. 10-09220, 2013 WL 1402414, at *6 (Bankr. N.D.
Iowa Apr. 3, 2013).  Thus, even if Defendant's conduct did somehow bar certain
equitable defenses, it would not bar Defendant from showing that Trustee has not
met the burden of proving up the elements of a constructively fraudulent transfer.
[3] This does not include the Best Value transaction checks.  They do not change the
analysis.

To establish a preferential transfer the Trustee must show that the transfer

(1) was made for the creditor's benefit; (2) was for a preexisting debt; (3) occurred

while the debtor was insolvent; (4) occurred within 90 days before the petition was

filed—or one year if the creditor is an "insider"; and (5) distributed more to the

creditor that it would have received in a Chapter 7 liquidation.  11 U.S.C. § 547(b)

(2014).  Trustee argues Defendant is an "insider," and the one-year period applies.

Defendant essentially concedes that Trustee has established the prima facie

elements of a preferential transfer, other than the "insider" requirement (which

extend the preference period from 90 days to one year).  While Defendant has

made some passing argument that Defendant was not an "insider," it has offered

little support for that assertion.  The Court will nevertheless address the issue to put

it to rest.

## A. Insider Status

To recover within the one-year period instead of the 90-day period before

the bankruptcy filing, the Trustee must show that Defendant was either a statutory

or non-statutory "insider." 11 U.S.C. § 547(b)(4)(B).  As this Court has previously

noted:

> Section 101(31)(B)(vi) defines the term "insider." Where, as
> here, Debtor is a corporation, the term "insider" includes a "relative of
> a general partner, director, officer, or person in control of the debtor."
> 11 U.S.C. § 101(31)(B)(vi). Under § 101(45), "relative" is defined as
> an individual related by affinity or consanguinity within the third
> degree as determined by the common law . . . ." Id. An "insider" can

33

also be what is referred to as a "non-statutory insider." A non-statutory insider "is said to be an entity with a sufficiently close relationship to the debtor that its conduct is made subject to closer scrutiny than those dealing at arm's length with Debtor." In re Riversideworld, Inc., 366 B.R. 34, 43 (Bankr. N.D. Iowa 2007).

Sarachek v. Cohen (In re Agriprocessors, Inc.), Bankr. No. 08-02751, Adv. No. 10-09197, 2013 WL 1385400 at *7 (Bankr. N.D. Iowa Apr. 3, 2013) (quoting

Sarachek v. Chabad of N. Fulton, Inc. (In re Agriprocessors, Inc.), Bankr. No. 08-02751, Adv. No. 10-09131, 2011 WL 4900037, at *6 (Bankr. N.D. Iowa Oct. 14, 2011).

The evidence shows that Defendant is both a statutory and non-statutory insider.  Defendant is a corporation owned by Gutel Tzivin, the niece of Aaron Rubashkin, the owner of Debtor and the father of Sholom Rubashkin, Debtor's former CEO.  This is consanguinity within the third degree, as required under § 101(31)(B)(vi) and § 101(45) for insider status.  See Stevenson v. Sensing (In re Herbison), Bankr. No. 96-28148-K, Adv. No. 97-0104, 1998 WL 35324197 (Bankr. W.D. Tenn. Mar. 24, 1998).

Defendant is also a non-statutory insider.  A non-statutory insider generally has a close relationship with the Debtor and its principle and did "not deal at arm's length with the debtor."  See In re Agriprocessors, 2013 WL 1385400, at *4; see also Carlson v. Farmers Home Admin. (In re Newcomb), 744 F.2d 621, 625 n.4 (8th Cir. 1984).  Whether the creditor had control over the Debtor is not the

dispositive factor—instead, it is whether the parties dealt at arm's length.  In re

Agriprocessors 2013 WL 1385400, at *7.

Here, the parties had a very close relationship and did not deal at arm's

length.  Aaron Tzivin admitted the close family, religious, and friendship ties

between the ownership and management of both companies.  Mr. Tzivin also

admits the loan agreement was entirely oral, and he did not require any promissory

notes for the loans as he would normally do.  Defendant never sought to curb

Debtor's practice of writing window checks—even after Debtor began falling far

behind in repayments.  Aaron Tzivin testified that he never asked Sholom

Rubashkin "what he was doing, why he was doing it, or how long he was going to

be doing it."  The relationship was based on trust.  This was not arm's-length

dealing.  As a result, Defendant is a non-statutory insider of Debtor, and the

Trustee may avoid as preferential transfers payments by Debtor to Defendant

within one year before filing unless Defendant proves its affirmative defenses.

## B.  Affirmative Defenses

Defendant's main argument is that three statutory affirmative defenses to

preferential transfer claims apply here.  First, Defendant argues that each transfer

was a part of a contemporaneous exchange for new value.  11 U.S.C.

§ 547(c)(a)(A)–(B).  Second, Defendant argues that all the transfers were in the

ordinary course of business.  Id. § 547(c)(2).  Third, Defendant argues that the

transfers are supported by subsequent new value.  Id. § 547(c)(4).  If any of these

defenses apply to a particular transfer, that transfer will not be avoidable as a

preference.  Id. § 547(c).

Trustee argued at trial that Defendant is barred from asserting these

defenses.  This theory is again based on Trustee's assertion that Defendant has

"unclean hands."  The Court rejects that argument for the reasons stated above—

there was absolutely no evidence offered to support it.  The Court will address each

of the asserted affirmative defenses.

### 1. Contemporaneous exchange for new value

Defendant argues that the short-term loan arrangement was intended to be,

and was in fact, a contemporaneous exchange for new value.  Section 547(c)(1)

provides:

> (c) The trustee may not avoid under this section a transfer—
>> (1) to the extent such a transfer was—
>>> (A) intended by the debtor and the creditor to or for whose benefit such transfer was made to be a **contemporaneous exchange** for **new value** given to the debtor; and
>>> (B) in fact a substantially contemporaneous exchange.

(emphasis added).  "New value" includes providing new unsecured credit.  11

U.S.C. § 547(a)(2).  Thus, Defendant must show that both Debtor and Defendant

intended that the exchange be contemporaneous, that the exchange was in fact

substantially contemporaneous, and that it was for new value.  Tyler v. Swiss Am.

Sec. (In re Lewellyn & Co., Inc.), 929 F.2d 424, 427 (8th Cir. 1991).

"The purpose of [this] defense[] is to protect transactions that do not

adversely affect other creditors because the estate has received new value."  Rocin

Liquidation Estate v. Alta AH & L (In re Rocor Int'l, Inc.), 352 B.R. 319, 330

(Bankr. W.D. Okla. 2006).  "[T]ransactions that appear at first glance to be a

contemporaneous exchange for new value will not be . . . absent a showing that the

parties actually intended the exchange to be contemporaneous." 5 Collier on

Bankruptcy § 547.43 (Alan N. Resnick & Henry J. Sommer eds., 16th ed. 2012).

"The critical inquiry in determining whether there has been a contemporaneous

exchange for new value is whether the parties intended such an exchange."  Id. at

428. (quoting In re Spada, 903 F.2d 971, 975 (3d Cir. 1990)) (internal quotation

marks omitted).  A credit transaction, however short-term, is "inherently not

contemporaneous [and so] cannot be intended to be contemporaneous."  Feltman v.

City Nat'l Bank of Fla. (In re Sophisticated Commc'ns, Inc.), 369 B.R. 689, 704

(Bankr. S.D. Fla. 2007) (opinion clarified on denial of reconsideration, Bankr. No.

00-17635-BKC-RAM, Adv. No. 02-1526-0BKC-RAM-A, 2007 WL 2257604

(Bankr. S.D. Fla. Aug. 1, 2007)).

Here, none of the transactions can be contemporaneous exchanges for new

value.  Aaron Tzivin specifically testified that Defendant and Debtor entered into a

37

credit arrangement.  Defendant tries to rely on Aaron Tzivin's additional testimony

that the parties intended the exchanges to be contemporaneous.  The Court does

not find that portion of Tzivin's testimony to be credible.  Moreover, even if the

loans were initially intended to be for only one day, it was still a credit

arrangement and therefore cannot be viewed as a contemporaneous exchange.

This issue is precisely the issue the court addressed in Sophisticated

Communications, Inc., and found that "delivering a cashier's check, essentially

cash, on day 1 in anticipation of repayment on day 2—is a short-term open credit

transaction" and so "is inherently not contemporaneous and, therefore, cannot be

intended to be contemporaneous."  In re Sophisticated Commc'ns, Inc., 369 B.R. at

703–04.  Like Sophisticated Communications, this case also involves "short-term

open credit transactions."  And because the transfers were a part of a credit

arrangement, however short-term, the parties by definition did not intend them to

be contemporaneous.  As a result, the preferential transfers are not protected by the

contemporaneous exchange for new value defense.

    Even if the Court assumed a loan arrangement could qualify as a

contemporaneous exchange, the factual record establishes that was, in fact, not the

practice of the parties.  Payments were made late, sometimes very late, and

Defendant did nothing to ensure quick payment or enforce the alleged oral terms of

the loan agreement that purportedly required next day repayment.  Defendant

simply turned its checkbook over the Debtor and left it to Debtor to get repayments made. Defendant did not even keep track of the timing of repayments. There was no contemporaneous exchange as a matter of law or fact.

## 2. Ordinary Course of Business

Defendant also has argued that the transfers occurred in the ordinary course of business. A trustee may not avoid a transfer made for a debt (1) "incurred by the debtor in the ordinary course of business," and (2) paid "in the ordinary course of business" of the debtor and transferee or "according to ordinary business terms." 11 U.S.C. §547(c)(2). "[T]o make out an ordinary course of business defense, the Defendants must show that the incurred debts, and the resulting transfers in payment of those debts, were made either in the ordinary course of business or according to ordinary business terms." Bruno Mach. Corp. v. Troy Die Cutting Co. (In re Bruno Mach. Corp.), 435 B.R. 819, 839-40 (Bankr. N.D.N.Y. 2010). The debt must both be incurred in the ordinary course of business and paid in the ordinary course of business between the parties, or according to ordinary business terms. See Martino v. Miszkowicz (In re Miszkowicz), Bankr. No. 11 B 40844, Adv. No. 13 A 00927, 2014 WL 3704251 (Bankr. N.D. Ill. July 24, 2014) ("Because the Court finds that the Defendants have not satisfied the threshold requirement that the underlying debt . . . [was] incurred in the ordinary course of business . . . it need not address whether the repayment transfers were made in the

ordinary course of business of the parties or whether they were made according to ordinary business terms.").

"[A] debt will be considered not incurred in the ordinary course of business if creation of the debt is atypical, fraudulent, or not consistent with an arms-length commercial transaction." Saracheck v. Lubicom, LLC (In re Agriprocessors, Inc.), Bankr. No. 10-09129, Adv. No. 10-09129, 2013 WL 1332270 at *5 (Bankr. N.D. Iowa 2013) (quoting Speco Corp. v. Canton Drop Forge, Inc. (In re Speco Corp.) 218 B.R. 390, 398 (Bankr. S.D. Ohio 1998) (internal quotation mark omitted)). The ordinary course of business defense should be narrowly construed. US Bank Nat'l Assoc. v. Petro Commercial Servs. (In re Interstate Bakeries Corp.), 499 B.R. 376, 386 (Bankr. W.D. Mo. 2013).

Here, the debt was not incurred in the ordinary course of business. The loans from Defendant to Debtor were not made in an arm's-length commercial transaction. Defendant effectively gave Debtor a line of credit on its checking account through the use of window checks. Defendant was not in the business of making loans and did not make loans to other entities. Defendant provided no oversight on Debtor's use of the window checks. Defendant did not require any promissory notes for the loans. Continued credit was not contingent on repayment. The credit relationship was based on trust and community. No one testified on behalf of Defendant or Debtor that this was a debt this Debtor incurred in the

40

ordinary course of its business.  As a result, the debts were not incurred in the

ordinary course of business.

The Court need not reach the second part of the test—whether the debts

were paid in the ordinary course of business between the parties or on ordinary

business terms.  The finding that the debt was not <u>incurred</u> in the ordinary course

of business is dispositive.  Were the Court to do so, however, the Court would

conclude the Debtor did not pay the debts in the in the ordinary course of their

business dealing or according to ordinary business terms.  Defendant simply ailed

to present sufficient proof of this at trial.  Defendant presented no employee with

the required knowledge to establish this defense.  The transfers were not made in

the ordinary course of business.

### 3.  New Value Advanced Post-Transfer

Defendant places the strongest reliance on the "subsequent new value"

defense under § 547(c)(4).  That section provides that the Trustee may not avoid a

preferential transfer "to the extent that, **after** [the preferential] transfer, such

**creditor gave new value** to or for the benefit of the debtor . . . and on account of

which new value the debtor did not make an otherwise unavoidable transfer to . . .

such creditor."  11 U.S.C. § 547(c)(4) (2014) (emphasis added).  The statutory

definition of new value is "money or money's worth in goods, services, or new

credit . . . but does not include an obligation substituted for an existing obligation."

41

Id. § 541(a).  New value advanced by a creditor after it receives a preferential

transfer from a debtor generally protects the earlier preferential payment from

avoidance because, "[i]f a creditor advances new value to the debtor, the **debtor's**

**assets have not been depleted to the disadvantage of other creditors**."  Jones

Truck Lines, Inc. v. Full Serv. Leasing Corp., 83 F.3d 253, 257 (8th Cir. 1996)

(quoting In re Kroh Bros. Dev. Co., 930 F.2d 648, 652 (8th Cir. 1991)) (internal

quotation marks omitted) (emphasis added).

The Eighth Circuit recently reiterated the standards for analyzing subsequent

new values cases:

> The subsequent new value exception in § 547(c)(4) provides that the
> trustee may not avoid a transfer "to or for the benefit of a creditor, to
> the extent that, after such transfer, such creditor gave new value to or
> for the benefit of the debtor."  **These preference rules are intended
> to discourage creditors from dismembering a debtor that is
> sliding into bankruptcy, to encourage creditors to work with
> troubled businesses, and to further "the prime bankruptcy policy
> of equality of distribution among creditors."**

Stoebner v. San Diego Gas & Elec. Co. (In re LGI Energy Solutions, Inc.), 746

F.3d 350, 353 (8th Cir. 2014) (quoting Jones Truck Lines, 130 F.3d at 326)

(emphasis added).  The Eighth Circuit again noted "'the relevant inquiry' under

§ 547(c)(4) [is] 'whether the new value **replenishes** the [bankruptcy] estate.'"  Id.

(quoting Kroh Bros. Dev. Co., 930 F.2d at 652) (emphasis added).

Thus, there are now three requirements for the new value defense:

> First, the creditor must have received a transfer that is otherwise avoidable as a preference under § 547(b).  Second, *after* receiving the preferential transfer, the preferred creditor must advance "new value" to the debtor on an unsecured basis.  Third, the debtor must not have fully compensated the creditor for the new value as of the date that it filed its bankruptcy petition.

Saracheck v. Lubicom, LLC (In re Agriprocessors, Inc.), Bankr. No. 10-09129,

Adv. No. 10-09129, 2013 WL 1332270, at *6 (Bankr. N.D. Iowa Mar. 29, 2013)

(citing Kroh Bros. Dev. Co. v. Cont'l Constr. Eng'rs (In re Kroh Bros.), 930 F.3d

648, 652 (8th Cir. 1991) (emphasis in original).

Answering whether new value was given does not end the inquiry.  "Under

§ 547(c)(4), courts should examine whether the alleged new value replenished the

estate."  Sarachek v. Hilgar (In re Agriprocessors, Inc.), Bankr. No. 08-02751,

Adv. No. 10-09217, 2014 WL 1454187 (Bankr. N.D. Iowa Apr. 15, 2014) (quoting

In re Kroh Bros. 930 F.2d at 651).  See also In re LGI Energy Solutions, 746 F.3d

at 353.  Because the "purpose of [this] defense[] is to protect transactions that do

not adversely affect other creditors because the estate has received new value,"

Rocin Liquidation Estate v. Alta AH & L (In re Rocor Int'l, Inc.), 352 B.R. 319,

330 (Bankr. W.D. Okla. 2006), the Court must examine the effect on the

bankruptcy estate.  Thus, a creditor can offset a preferential transfer only to the

extent that the creditor extends further unsecured credit that actually replenishes

the estate.  As a result, "the availability of the defense . . . depends on the ultimate

effect on the estate." In re Kroh Bros., 930 F.3d at 652.  As Trustee argues, the

Eighth Circuit thus made clear that replenishing the estate is the measuring stick

under § 547(c)(4).  In re LGI Energy Solutions, 746 F.3d at 353–54.  The Eighth

Circuit also noted there that application of the rule of replenishing should work

both ways:  new value paid must actually replenish the estate before the creditor

gets the protection of § 547(c)(4), but a creditor should not be denied the benefit of

the statute when it would effectively result in the estate being "doubly

replenished."  Id.  The Circuit Court noted this would do "fundamental violence"

to "the prime bankruptcy policy of equality of distribution among creditors."  Id.

The Circuit Court noted that any "inequitable result" that contradicted that rule

must be "mandated by the statute."  Id. at 354.  The Eighth Circuit repeatedly

referred to the trustee's "inequitable interpretation" of the statute before

concluding it was not mandated by the statute.  See id.  Thus, the concern with the

new value's ultimate effect on the estate reflects the equitable underpinnings of §

547(c)(4) and the policies behind preferential transfer law.

Trustee makes three main arguments from the textual language and

standards laid out above.  Trustee argues:  (1) that Defendant failed to show the

alleged "new value" "remained unpaid"; (2) that the alleged "new value"

Defendant provided did not replenish the Estate and instead simply assisted

Rubashkin in furthering the fraud and deepening Debtor's ultimate losses; and (3)

that even if some subsequent new value was given, Defendant overstates the

amount.  The Court will address those arguments in that order.

### a.  Trustee's Allegation that Defendant Failed to Show the New Value Given "Remains Unpaid"

Trustee points out the 8th Circuit has stated that Defendant can use the

subsequent new value set-off only to the extent it remains unpaid by Debtor.  In re

Kroh Bros. Dev. Co., 930 F.2d at 653 ("section 547(c)(4) is not available to a

creditor to the extent the creditor has received payment from the debtor for the

goods or services constituting new value.").  Trustee suggests that Defendant has

failed to show that the multiple millions Defendant claims it provided in

subsequent new value during the preference period were not repaid in full or

significant part by the millions Debtor paid Defendant back during that period.

This "remains unpaid" issue has occupied many courts and commentators.

See, e.g., 5 Collier on Bankruptcy § 547.04[4][e] (Alan N. Resnick & Henry J.

Sommer eds., 16th ed. 2012).  The Court, however, need not spend much time with

the issue here.  After Kroh Bros., the Eighth Circuit clarified that it was not

applying the rule.  See Jones Truck Lines, Inc. v. Central States, Se & Sw Areas

Pension Fund, 130 F.3d 323, 328–29.  In Jones Truck Lines, the Eighth Circuit

specifically rejected an argument that the language from Krohs Bros. was to be

read broadly to mean that any new value the defendant extended could not be used

as a defense to the extent the debtor later made payments to the creditors—i.e.

45

repaid the new value.  Id.  The Eighth Circuit noted that the statute itself defines

"subsequent new value as value not offset by '*an otherwise unavoidable transfer*'

to the creditor."  Id.  (emphasis in original)  Because the payments made after new

value was extended in that case (and this case) were avoidable themselves as

preferences, they did not limit the amount of the creditor's subsequent new value

defense.  The Court noted Kroh Bros. did not actually address that specific issue.

The Eighth Circuit concluded that "we agree with courts that have construed our

reference to 'remaining unpaid' as 'an adequate shorthand description of

§ 547(c)(4)(B).'"  Id. at 329.  The Circuit made clear, as have most other cases,

that while an adequate shorthand description, it is not a full description and should

not be applied as such.

This clarification by the Eighth Circuit puts it in line with the more recent

and precise recitations of the standard.  5 Collier on Bankruptcy § 547.04[4][e].

The Collier treatise notes:

> Earlier decisions often made reference to the purported need for
> subsequent new value to remain "unpaid" in order to qualify under the
> section 547(c)(4) exception.   With increasing consistency, more
> modern decisions have rejected the notion that the new value must
> remain "unpaid," as representing an oversimplification of the proper
> application of section 547(c)(4). These later decisions have
> recognized that, while it is true that all unpaid subsequent new value
> should fall within the scope of section 547(c)(4), this does not mean
> that all subsequent new value upon which payment has been made
> necessarily falls outside the scope of section 547(c)(4). Thus, if
> subsequent new value has been paid by a payment that is itself
> avoidable, then it should still qualify as subsequent new value for

purposes of section 547(c)(4). Moreover, if subsequent new value has been paid by a payment that would be avoidable but for the fact that the latter payment is itself unavoidable as a result of the further application of the section 547(c)(4) exception, then the original subsequent new value should be recognized as still falling within the scope of the section 547(c)(4) exception. This construction more fully takes into account the subtle and intricate wording of section 547(c)(4). However, to the extent that the debtor made an unavoidable transfer on account of the new value, the "new value" defense does not apply.

Id. (footnotes omitted).  Recent cases have made this more clear.  "The trustee should not be able to assert the new value was paid if the trustee is asserting that the paying transaction was in fact a preference which the trustee can avoid," Id. (citing Wahoski v. Am. & Efrid, Inc. (In re Pillowtex Corp.), 416 B.R. 123, 128 (Bankr. D. Del. 2009)), because "[t]here is no logical reason to distinguish between a creditor that was paid by an avoidable transfer and one that was never paid at all." In re Pillowtex Corp., 416 B.R. at 130 (Bankr. D. Del. 2009) (quoting Official Comm. Of Unsecured Creditors of Maxwell Newspapers, Inc. v. Travelers Indemnity Co. (In re Maxwell Newspapers, Inc.), 192 B.R. 633, 639 (Bankr. S.D.N.Y. 1996)).  Most importantly, "[Section] 547(c)(4) does not contain any language that even suggests that the new value rule contained therein is somehow to be limited to unpaid invoices."  Harris P. Quinn, The Subsequent New Value Exception Under Section 547 (c)(4) of the Bankruptcy Code-Judicial Gloss Is Creditors' Loss, 24 Mem. St. U. L. Rev. 667, 684 (1994).  The Court rejects Trustee's argument here that Defendant failed to show the new value remained

unpaid.  Thus, the Court declines Trustee's request to apply the "remains unpaid"

analyses.

### b.  Trustee's Argument that Any New Value Defendant Provided Only Deepened the Debt and Thus Did Not Replenish the Estate

The facts are undisputed here that Defendant loaned Debtor money (with

Sholom Rubashkin effectively doing both the lending and repayment) up until the

Debtor filed its bankruptcy petition.  Defendant argues that all of the subsequent

new value payments it made during the preference period, when properly analyzed,

show that it provided more in subsequent new value than it received in

"preferences" during that period.  Defendant concludes that all of these payments

thus replenished the estate and can be used as set-offs to any previous preferential

payments.

Trustee argues that none of the alleged "new value" payments replenished

the estate and thus provide no basis for the § 547(c)(4) defense.  Trustee contends

that all of the alleged "subsequent new value" payments—like virtually every loan

made by Defendant at any time—simply assisted Sholom Rubashkin in furthering

his fraudulent scheme and plunging Debtor further into debt.  Trustee notes the

ultimate effect of the loans from Defendant resulted in a "double-liability" of

Debtor.  The first was a liability to Defendant.  The second, disguised liability, was

to Debtor's primary lender—which calculated the amount of its lending to Debtor

based on the accounts receivable and actual accounts received.

Trustee points out that virtually all the money at issue here that Defendant allegedly sent to Debtor after preferential payments either:  (1) went into the Decorah lock-box account (which was only for payments on accounts receivable) and allowed huge credit extensions from First Bank, to further the overall fraud; and/or (2) went to "pay off" false invoices to Defendant created by Rubashkin to entice even more lending from First Bank.  Trustee asserts none of that alleged "subsequent new value" actually replenished Debtor's estate in any way, and thus first asks the Court to deny Defendant **any** benefit of the "subsequent new value" defense.  If the Court declines that argument, Trustee asks the Court to substantially limit the "new value" set-off for Defendant based on false invoices argument.

### (i)  Trustee's Request to Deny Any "Subsequent New Value" Defense Because All Defendant's Money Assisted the Fraud

This argument suggests that because the net effect of Defendant loaning or giving Debtor money plunged Debtor deeper into debt, none of it can be new value that "replenished" the estate.  The Court rejects that argument.  The Court finds that Trustee reads the "replenishing" requirement too broadly.

Trustee's argument is essentially that the "new value" given can and should be negated by events that happen **after** the Defendant made the transfer of that new value.  Trustee relies on events occurring **after** Debtor received the new value as

negating any "replenishment" of the estate.  A blanket application of this argument is contrary to the applicable case law.

The Tenth Circuit Bankruptcy Appellate Panel rejected an analogous argument in Gonzales v. Nabisco Div. of Kraft Foods, Inc. (In re Furr's Supermarket, Inc.), 317 B.R. 423, 430–31 (B.A.P. 10th Cir. 2004).  There, trustee argued that perishable goods transferred by a creditor and claimed to be "new value" under § 547(c)(4) were ultimately returned—and thus the returned goods "never served to replenish the estate for purposes of § 547(c)(4)."  Id.  The Tenth Circuit BAP concluded:

> Put another way, the Trustee takes the position that, due to its ultimate return, the Returned Product provided no value to the estate at the time it was delivered to Furr's. The argument ignores the rulings of the United States Court of Appeals for the Tenth Circuit as well as the Tenth Circuit Bankruptcy Appellate Panel that state that property that is transferred is valued **at the time of the transfer**. At the time of its delivery to Furr's, the Returned Product had a value of $90,180.74. Therefore, the pre-petition estate of Furr's was increased (or, for our purposes, "replenished") by an amount equal to the value of the Returned Product at the time of its delivery. The fact that the Returned Product was returned to Nabisco after it lost its value does not change this fact, and is not relevant to the "new value" analysis.

Id. (emphasis added).  The BAP further amplified this rationale in a footnote:

> The weakness of the Trustee's logic becomes clear when one considers the following hypothetical. Assume that goods are delivered from a buyer to a seller with no right of return with a value of $90,180.74 upon their delivery. After receipt by the buyer, for whatever reason, the goods lose their value. As a result of the loss of value, the buyer is unable to obtain any economic benefit from the purchase of the goods. Let us further assume that the buyer files

50

bankruptcy and claims that the seller is the recipient of a preferential payment made before the goods were delivered. **Under the Trustee's reasoning, the seller would not be entitled to consider the supplying of these goods as the supplying of "new value," since the buyer/debtor was unable to ultimately generate any economic benefit from the goods. "New value" would be found only when the debtor was able to turn the delivered goods into revenue. Section 547(c)(4) contains no such requirement.**

Id. at n.27 (emphasis added). The same analysis and conclusion apply here.

Trustee's argument seeks to tie the "new value" and "replenishment" analysis, like in Furr's, to what happened after the creditor (defendant here) provided new value. The new value and whether it replenished the estate are determined at the time the funds were sent to Debtor.

The Eighth Circuit adopted a somewhat similar analysis of subsequent new value. Bergquist v. Anderson-Greenwood Aviation Corp. (In re Bellanca Aircraft Corp.), 850 F.2d 1275, 1280–81 (8th Cir. 1988). There, the Circuit noted:

As the bankruptcy court cogently stated, the trustee misstates the policy behind the subsequent advance rule, though, by suggesting that the test is whether a new value advance makes available additional assets for distribution to creditors. The clear intent of Congress is that new value advanced by creditors should be available to debtors in the conduct of their business. Consequently, a debtor's purchase of supplies or payment of employee salaries and other expenses with new value received is the fully anticipated result of a new value advance, even though the immediate effect of such may be to temporarily expend funds otherwise available for distribution.

Id. In other words, the Eighth Circuit adopted the Bankruptcy Court's reasoning that it is the fact a creditor makes the new value available to a debtor, not the

debtor's use of it that is the focus.  This means that "replenishment" happens when
the payment is made, and does not depend on "whether a new value advance
makes available additional assets for distribution to creditors."  Id.

Here, Defendant actually provided money to Debtor and much of it
unquestionably provided real "value" at the moment it came into Debtor's
possession.  What Debtor does with the funds is not a part of the analysis in a case
like this where there has been no showing Defendant knew what Debtor was doing.
Whether the Defendant provided new value in the form of cashier checks, or
inventory does not make a difference.  In fact, some cases have gone as far as
holding that even a straight out gift to Debtor can constitute new value for
purposes of the § 547(c)(4).  Russell v. Jones (In re Pro Page Partners LLC), No.
04-5804, 151 Fed. Appx. 366 (6th Cir. Oct. 6, 2005); McKluskey v. Schabel (In re
Schabel), 338 B.R. 376, 381–82 (Bankr. E.D. Wis. 2006).  The simple fact that
virtually all the money Defendant provided to Debtor was used by Debtor to enable
or facilitate the overall, massive fraud of Sholom Rubashkin—standing alone—
does not itself remove that money from the "new value" calculation.  The language
of § 547(c)(4) simply does not limit new value in a way that can deny its
application in favor of Defendant here.  See Harder v. JPPCS, Inc. (In re Graff),
454 B.R. 745, 752–54 (Bankr. W.D. Mo. 2011).  In fact, in Graff, Judge Dow
specifically addressed the application of § 547 in allegedly fraudulent

circumstances.  Id. at 752.  "Fraud is neither an element of proof on a prima facie

preference avoidance action, nor one of the enumerated defenses to the merits of

such action."  Id. (citing In re Kmart Corp., 318 B.R. 409, 417 (Bankr. N.D. Ill.

2004)).  "Section 547 is not, in its face, an anti-fraud provision.  There are

independent laws to redress fraud."  Id. (quoting In re American Continental Corp.,

142 B.R. 894, 900 (D. Ariz. 1992)).  Judge Dow concluded:

> if the Trustee believes that the transfers to these Defendants were
> fraudulent as to the Debtors' other creditors, the proper remedy would
> be to file an avoidance action under § 544 or § 548. In essence, the
> Trustee is attempting to expand the scope of the preference section in
> a way that goes well beyond what its framers intended.

Id. at 752.  The same conclusion applies here.

### (ii) Debtor's False Invoices to Defendant Paid
### By Defendant's Loans to Debtor

The law stated above requires the Court to conclude all money Defendant

provided Debtor as loans after the payment of a preference can be analyzed as

potential "new value" to set-off preference liability under § 547(c)(4).  This

includes Debtor's direct use of the Defendant's money to allow Debtor to both

create and pay false invoices to Defendant.  The Trustee placed great emphasis on

this issue in making his case.

The Trustee has not made it readily apparent why the money tied to false

invoices is different than money that could be linked to the rest of the fraud.  Aaron

Tzivin testified that he had no knowledge of or control over what the Sholom

Rubashkin did.  He gave Sholom Rubashkin window checks based on his
Orthodox Jewish faith to help those in his community that ask.  He did not know
that Sholom Rubashkin would improperly use some or all of these window checks.
Defendant contends that what the Debtor did with the checks "was not the
defendant's responsibility."

Mr. Tzivin's assertion is true and supported by case law.  It would be
different if Defendant knew of Debtor's creation and payment of fraudulent
invoices to Defendant.  This would be proof of actual fraud under § 548, however,
not a reason to deny application of a defense to a preference claim under
§ 547(c)(4).  The fact that Defendant gave Debtor total freedom with Defendant's
checking account, and effectively gave Debtor control over both the loans and
repayments is certainly a troubling fact.  Sholom Rubashkin—not Defendant or
Mr. Tzivin—determined when and how much to loan and repay.  Trustee's
argument here is essentially that Defendant's decision to surrender control of both
sides of the loan arrangement to Debtor effectively allowed Debtor to act as or
pose as Defendant under the cloak of implied authority from Defendant.

The problem with Trustee's position is two-fold.  Trustee provided neither
supporting authority nor a strong factual showing to establish any such implied
authority or agency.

While Defendant's lax oversight of the loans and repayments may have made it easier for Rubashkin to continue his fraud unchecked, it does not link Defendant to the fraud or any illegal conduct.  Surrendering a checkbook to Debtor, or providing easy access to an account does not establish Defendant provided no new value.  Cases have held that even an outright gift of money—for which no oversight is required or expected—qualifies as new value.  In re Pro Page Partners LLC, 151 Fed. Appx. 366; In re Schabel, 338 B.R. at 381–82.  Funds provided by a gift would have made it every bit as easy for Solom Rubashkin to engage in his fraud.  He could have created false invoices and used the gift funds to pay them (on phony checks or not) and continue his con.  While better oversight by Defendant and Mr. Tzivin would have been preferred—and perhaps brought issues to light earlier—it does not deprive Defendant of its statutory defense under § 547(c)(4).

The Court has several times in these proceedings, including at trial, expressed great skepticism about Trustee's suggestions that Defendant was involved in the fraud of Sholom Rubashkin in any way.  The Court still believes and finds that Trustee has failed to prove Defendant knowingly, intentionally, or purposefully assigned in the fraud.  Based on the record in this case, the Court finds that without such a showing, Trustee cannot show that Defendant's conduct made the defense under § 547(c)(4) unavailable.

55

### (ii)  Trustee Correctly Notes Loans to "Best Value" Are Not New Value

As noted several times above, Sholom Rubashkin frequently wrote window checks to Best Value. Those checks were loans to Best Value.  The money went to Best Value.  As a result, the credit Defendant extended to Best Value did not replenish the estate, and the Best Value checks cannot be considered new value. The fact that Defendant had no control over the window checks is irrelevant.

Although Defendant asserts that any window check "was for the benefit of the debtor," these checks did not provide Debtor with new value.  Defendant does not show how the estate was replenished by the loans to Best Value.  Thus, the loans to Best Value are not new value and are not included in the new value analysis.

The other checks that the Court founds to be constructively fraudulent transfers are also not counted in the new value analysis.

### (iii)  Whether Debtor Correctly Applies The New Value Analysis

When calculating new value credit, the Court uses the "Garland Rule"—or the subsequent advance approach—which allows a creditor to apply new value to any previous preferential transfer.  <u>Garland v. Union Elec. Co.</u> (<u>In re </u>Garland), 19 B.R. 920 (Bankr. E.D. Mo. 1982).  Under the Garland Rule, the Defendant "need not match each instance of new value with a specific preferential payment." <u>Schnittjer v. Pickens</u> (<u>In re Pickens</u>), Bankr. No. 06-01120, Adv. No. 06-9166,

2008 WL 346147 (Bankr. N.D. Iowa Feb. 5, 2008) (quoting In re Bridge Info.

Sys., Inc., 287 B.R. 258, 267 (Bankr. E.D. Mo. 2002)).  "The 'Garland Rule'

allows an extension of subsequent new value to apply against any preceding

preferential transfer."  Sarachek v. Hilgar (In re Agriprocessors, Inc.), Bankr. No.

08-02751, Adv. No. 10-09217, 2014 WL 1454187 (Bankr. N.D. Iowa Apr. 15,

2014) (citing In re Acoustiseal, Inc., 318 B.R. 521, 525 (Bankr. W.D. Mo.2004)).

Defendant provided a good summary of how the subsequent new value rule

of § 547(c)(4) applies to this case under Garland.  That analysis is found in Table 6

of Defendant's Appendix to post-trial brief.  The Court adopts that analysis with a

significant alteration.  The Court finds Defendant has failed to show that the last

three "wire transfers" listed in that chart, occurring in September 2008, in fact went

to Debtor.  There is limited information about those transfers in the record.

Neither Mr. Tzivin or Ms. Tzivin could provide any specific recollection about

those transfers and thus had no knowledge to support the assertion the wires went

to Debtor.  To the extent there is some notation of a transfer to Agriprocessors, no

one or no exhibit demonstrated this referred to Agriprocessors in Iowa—not

Agriprocessors in Brooklyn.  Defendant specifically noted it paid money out to

both.  Defendant simply failed its burden to show these wire transfers went to

Debtor.  Subtracting those transfers out of the subsequent new value analysis,

Defendant showed all but $92,384.13 of the preferential transfers could be offset

by the subsequent new value Defendant provided.

### Conclusion

**WHEREFORE**, judgment is entered in Plaintiff's favor in the amount of

$1,389,534.81.

Dated and Entered:  October 22, 2014


_____

Thad J. Collins
Chief Bankruptcy Judge

## Appendix – Loans and Payments without Best Value transactions

| Clear Date | Payment | Loan | Balance |
|---|---|---|---|
| 08/02/07 | | $125,000.00 | ($125,000.00) |
| 08/03/07 | $125,000.00 | | |
| 08/09/07 | | $75,000.00 | ($75,000.00) |
| 08/13/07 | $75,000.00 | | |
| 08/15/07 | | $68,749.50 | ($68,749.50) |
| 08/15/07 | | $39,338.07 | ($108,087.57) |
| 08/16/07 | $80,000.00 | | ($28,087.57) |
| 08/16/07 | $30,000.00 | | $1,912.43 |
| 08/31/07 | | $60,444.36 | ($58,531.93) |
| 09/04/07 | $60,000.00 | | $1,468.07 |
| 09/04/07 | | $80,000.00 | ($78,531.93) |
| 09/06/07 | $80,000.00 | | $1,468.07 |
| 09/20/07 | $59,500.00 | | $60,968.07 |
| 12/05/07 | | $88,342.83 | ($27,374.76) |
| 12/07/07 | $35,000.00 | | $7,625.24 |
| 12/07/07 | $50,000.00 | | $57,625.24 |
| 12/14/07 | | $35,000.00 | $22,625.24 |
| 12/18/07 | $35,000.00 | | $57,625.24 |
| 12/31/07 | $7,500.00 | | $65,125.24 |
| 01/03/08 | $40,500.00 | | $105,625.24 |
| 01/03/08 | | $54,342.35 | $51,282.89 |
| 01/03/08 | | $62,570.15 | ($11,287.26) |
| 01/07/08 | $72,000.00 | | $60,712.74 |
| 01/07/08 | $45,000.00 | | $105,712.74 |
| 01/07/08 | $5,700.00 | | $111,412.74 |
| 01/10/08 | | $45,778.68 | $65,634.06 |
| 01/14/08 | $46,000.00 | | $111,634.06 |
| 01/16/08 | | $54,865.27 | $56,768.79 |
| 01/17/08 | | $46,895.25 | $9,873.54 |
| 01/18/08 | | $36,025.09 | ($26,151.55) |
| 01/18/08 | $55,000.00 | | $28,848.45 |
| 01/22/08 | $55,000.00 | | $83,848.45 |
| 01/22/08 | $52,000.00 | | $135,848.45 |
| 01/22/08 | $75,000.00 | | $210,848.45 |
| 01/23/08 | | $75,498.13 | $135,350.32 |
| 01/23/08 | | $58,678.55 | $76,671.77 |
| 01/23/08 | | $36,555.99 | $40,115.78 |
| 01/23/08 | | $34,285.68 | $5,830.10 |
| 01/23/08 | $38,000.00 | | $43,830.10 |
| 01/24/08 | | $44,589.33 | ($759.23) |
| 01/24/08 | $71,000.00 | | $70,240.77 |